Joseph H. LANE et al.

v.

The UNITED STATES.

No. 132–79C.

United States Court of Claims.

Jan. 28, 1981.

William E. Persina, Washington, D.C., attorney of record for plaintiffs. Robert M. Tobias, Washington, D.C., of counsel.

Eugene R. Sullivan, Washington, D.C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D.C., for defendant.

Before COWEN, Senior Judge, and NICHOLS and SMITH, Judges.

## ON DEFENDANT'S MOTION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC

NICHOLS, Judge:

Defendant moves for rehearing and there is no cross-motion. Our decision, *Lane v. United States*, Ct.Cl. 633 F.2d 1384 (1980), decided against plaintiffs' claims for reinstatement and back pay and those issues are not here involved. We also dismissed defendant's counterclaim for recovery of plaintiffs' illicit gratuities received by them from Gulf Oil Corporation, a taxpayer to whose audit they were assigned. The ground we assigned was laches by the government. This seems to have startled defendant, since dismissal of government counterclaims on laches grounds are far from common, if indeed it has ever occurred. Defendant's brief in support of its motion is of more than ordinary emphasis. Defendant was on notice that plaintiffs relied on laches as one of their defenses to the counterclaim, and failed to make several of the points it now relies on. We could disregard the new material on authority of *General Electric Co. v. United States*, 189 Ct.Cl. 116, 117–18, 416 F.2d 1320, 1321 (1969). However, defendant does contribute to our fear that our decision will be misunderstood and misapplied as a precedent. We cannot say no one could misunderstand our decision when someone has. If this case should go to the Supreme Court, that body is entitled to have the most precise statement possible as to the nature and dimensions of the rule we rely on.

At the outset we note that defendant's counterclaim for the illicit gratuities is not founded on positive statute but relies on doctrines developed before the abolition of the distinction between law and equity, and on the equity side of the court, by judges sitting in equity. This is clear from what appears the seminal case cited by defendant, *United States v. Carter*, 217 U.S. 286, 30 S.Ct. 515, 54 L.Ed. 769 (1910). Carter was an officer of the Army Engineers, who awarded work to a construction contractor on terms highly favorable to it, and received a third of the contractor's profits through an intermediary. The proceeding below was in the nature of a bill for an accounting. The theory originally was a conspiracy to defraud, but the conspiracy was not clearly made out. The profits were, however, traced to Carter. The Court held proof of a conspiracy was unnecessary; that in view of Carter's position of trust and confidence as a government official, tracing part of the profits to him was enough to sustain the bill. That a bill for an accounting is or was for a form of equitable relief is well known. *E. g., Klamath and Modoc Tribes v. United States*, 174 Ct.Cl. 483 (1966). The Supreme Court refers, not to *former* cases involving govern-

ment employees, but cases of illicit profiting by trustees and agents in more private capacities. Cases cited are largely from the English Chancery courts. Defendant quotes *Jankowitz v. United States*, 209 Ct.Cl. 489, 506, 533 F.2d 538, 548 (1976) to the effect that the obligation of an agent of the government to account to his principal for a payment illegally received, is premised upon an obligation created by law, and derives from a contract implied in law. These statements are accurate as applied to the situation created by abolition of the distinction between law and equity and cannot be read as contrary to our conclusions respecting the origin and basis of the rights defendant asserts here.

The maxim that "he who seeks equity must do equity," would seem to have special application to a government claim not founded on statute, or recognized property or contract rights, but originating wholly in courts of equity and equity concepts. Since judges invented the doctrine, they may be allowed to fix its limits. Our holding, therefore, is not to be construed as extending to government claims based on, *e. g.*, the False Claims Act, 31 U.S.C. § 231 and ff, the Contract Disputes Act, 41 U.S.C. § 601 and ff, or other law. Whether laches are ever available as a defense against government counterclaims of these kinds must wait for decision until a case arises, and is not decided here.

The want of equity in defendant's claim rests principally in the prejudicial delay in asserting it; prejudicial because the defendant's case on quantum depends on tainted records made by the parties who allegedly paid the gratuities on behalf of Gulf. Their full accuracy is not admitted, though plaintiffs did not deny receiving gratuities in substantial amounts. When memories were fresh, the itemization of each martini and each greens fee could have been checked with some hope of accuracy. Now this can be no longer done, and we will be asked to take on faith records made by corrupt persons who may well have diverted company entertainment funds to other purposes and falsely recorded them as expended on the plaintiffs.

A subordinate theme in the want of equity cacophony is trivialization and the waste of judicial resources in pursuit of trivial claims. Defendant writes grandly of "bribery, breach of fiduciary duty, and breach of their employment contracts." The fact is that no bribery was imputed to the plaintiffs herein, no breach of fiduciary duty was alleged, and like most federal employees, they did not hold employment contracts. Plaintiffs are, *simpliciter*, persons who accepted gratuities, petty ones separately considered, substantial in the overall. *Carter*, on whose behalf an activist Supreme Court transmuted an equitable doctrine from one context to a different one, was an evil doer on the grand scale. He enjoyed the distinction of having been criminally convicted by a general court-martial. The illicit profits traced to him amounted to over $500,000, a sum which, in the gold backed dollars of those days, would purchase more than a cup of coffee. Defendant has hitherto hardly ever, if ever, counterclaimed for *Carter*-type equitable relief in the numerous cases brought in this court by persons removed from federal employment for accepting mere gratuities. *Jankowitz, supra*, was, if not of *Carter* magnitude, at least a case of criminal bribery. It looks as if defendant now wants a precedent for chasing down the value of each and every martini consumed as a gratuity by a federal employee. If it has in mind any distinction between our instant case and others still more trivial, it has not articulated what the distinction is.

Defendant has, quite properly, warned federal employees against accepting gratuities, but such warnings do not include statements that by accepting a gratuity the employee becomes liable for the gratuity if, but only if, he sues for back pay.

In absence of any other articulation, it seems as if the *Carter*-doctrine counterclaim is a sometime thing, to be invoked by

the government attorney at his whim and pleasure. In such circumstances, it is not strange that an appearance of evil should arise in the seeming use of the counterclaim as retaliation for seeking judicial review.

We said, somewhat indefinitely, that the Carter-type claim to avoid laches should be "asserted" when the employing agency knows the facts, without awaiting the tedious process of administrative review of the adverse action. Whatever "asserted" meant, it did not necessarily require actual suit. Defendant in its motion now seems to tell us the agency could not "assert" the claim because it is barred from doing so by the Federal Claims Collection Act of 1966, 31 U.S.C. § 951 and ff. When there is an indication of fraud or the presentation of a false claim or "misrepresentation," agencies can do nothing but refer the matter to the Justice Department. We can assume, arguendo, the agency can not properly tell its employee he has been observed consuming three gratuitous martinis, and he can settle the matter for $7.50, plus the waiter's tip (1980 dollars). If this is correct, and we do not deny it, we think that, to avoid laches, agency heads could refer the facts in gratuity cases to the Attorney General without awaiting the outcome of administrative removal proceedings. When they suspected criminality, they would likely do more, and suspend administrative action pending resolution of the criminal side of the case. What they must do respecting relatively trivial noncriminal gratuity cases to avoid imputation of laches, we do not presume to tell them, only that, if nothing is done—while administrative proceedings drag along—the possible imputation of laches will exist, and if collecting the $7.50 is that important, nothing in the Federal Claims Collection Act prevents the matter being referred to Justice at once.

Defendant, however, claims the benefit of a universal rule that laches do not run against the sovereign. See Costello v. United States, 365 U.S. 265, 281, 81 S.Ct. 534, 542, 5 L.Ed.2d 551 (1961); Guaranty Trust Co. v. United States, 304 U.S. 126, 132, 58 S.Ct. 785, 788, 82 L.Ed. 1224 (1938); Utah Power & Light Co. v. United States, 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917); International Telephone and Telegraph Corp. v. General Telephone & Electronics Corp., 518 F.2d 913, 928 (9th Cir. 1975). While originating in notions of royal infallability, this rule is generally imputed in modern times to a policy against allowing public property and rights to suffer by the negligence of public servants. Modern statements of the rule are usually so phrased as to allow the occurrence of exceptions. The reasons why an exception should occur in the instant situation have already been stated and need not be repeated. We need only add an assurance that we do not consider we have overruled, nor do we intend to overrule, the Supreme Court cases above-cited. The public policy basis of the rule speaks in favor of an exception to it in the instant case. This case will remain unique unless defendant makes a practice of asserting Carter-type counterclaims belatedly in noncriminal gratuity cases after the filing of petitions to secure review of adverse actions.

Finally, defendant says it is entitled to use all the time allowed it by the statute of limitations on government claims. 28 U.S.C. § 2415. The linkage of laches to limitations is a false one. The doctrine of laches is kept alive for the very purpose that statutes of limitations alone will not avert the prejudicial exploitation of delay in some circumstances. In Deering v. United States, 223 Ct.Cl. ——, 620 F.2d 242 (1980), we rejected as a precedent, and overruled Sidoran v. United States, 213 Ct.Cl. 110, 550 F.2d 636 (1977) because the latter case made a false linkage between laches in enforcement of servicemens' claims and congressional policy respecting the running of limitations against them. We decline to declare such a linkage here.

A majority of active judges not having voted for rehearing en banc, rehearing en banc is denied. The judgment of the court

is reaffirmed in all respects and the motion for rehearing on the counterclaim is denied.